Our next case for argument is 24-1039, Finesse Wireless versus AT&T Mobility. Mr. Lampkin, please proceed. Thank you, and may it please the Court. Morning. I'd like to begin with the 775 patent before turning to the 134, and then the $166 million verdict that was based on the price of Spectrum. For the 775 patent, Finesse failed to show literal infringement because, first, the claims require three signals to perform seven specified simple multiplications. The accused devices use two signals, not three. They use three multiplications, not seven. And those aren't even the same multiplications. And that's without getting into the definition of co-located that appears in the specs. But do the three signals have to be unique? No, Your Honor, but they must be, according to the Court's definition, separately identifiable. And what the expert did here is he simply counted the same signal twice, and that's not separately identifiable. For example, if the Court were to turn to page 14,000... So if they were, for example, copied, you know, replicated, they would be separately identifiable. That would be if you have two things. For example, I have two copies of a painting. They might not be unique. They're identical copies, but they're separately identifiable. But if I had one copy, I couldn't count that copy twice and say I have two separately identifiable paintings. There's only one painting. And so your argument is the Nokia documents don't demonstrate that the signals are copied such that even though there's only two unique signals, there are, in fact, seven signals, or three signals, or whatever it is. I don't know. Sorry. And I think more to the point, Welles, their expert... More to the point, it's not the thing the judge wants to hear. She wants to hear, yes, Your Honor, you're right, and I have another thing. The answer is yes, and I have something else, which is Welles' own testimony, Finesse's expert's own testimony. In trying to get to three signals, he explained to the jury exactly what he was doing. And if the Court were to turn to page 14,969 of the record, lines 2 to 3, he says, quote, and I am... Hang on one second. 14 what? 969, and it's lines 2 to 6. And he's saying, quote, I am really just using two signals in each equation to do this mapping. And if you look further down to line 711, he says, I'm using the signal X1 twice, and I'm using the signal X2 once. I can use the same signal twice. And if you flip to 15,024, lines 2 to 3, I take two signals, and I map it to the three signals. Oh, I'm sorry. What's the other page? 15,024. My apologies. I take two signals, lines 2 to 3. I take two signals, and I map it to the three signals that are in the claim. And finally, lines 8 to 11 on the same page. Question. You have one input signal, X2, but you map it to the same signals in the claims S2 and S3. Yes, I do. Each time he admits, he's not saying there's a copy. He's saying he's taking the same signal and pointing it and mapping it to two different things. And that's not how anyone counts three signals. If I were to say I'm before a five-judge panel because I have judge 1, judge 2, judge 3, judge 4, judge 5, no one would take that seriously as a method of counting. You made me the crazy three-headed person. I got it. Go ahead. Keep going. I just gave you three votes, Your Honor. So, and the district court said, you know, it'll take it if there's evidence of two signals, like X1 and X2, plus a copy of those signals. But you scour the record, and there's no place an expert says, or anyone says, you know what, there's two copies of X1, X2, one of them's copied, and we have three signals. So they're stuck with two signals, not three, and there is no infringement. And that's even before we get to... I thought that there was testimony, potentially from Dr. Wells, that they were trying to point to in terms of pointing to the modulus and complex conjugate, if I'm using the right terminology, in addition to X1 and X2, to try to say that they have the right number of signals.  Is that right, or is my understanding correct in terms of the argument first? There's two difficulties with that theory. First, it talks about the signals S1, S2, S3, and pulse, and the multiplication of those signals, S1 times S2 times S3, for example. If you're looking for multiplications of S1, S2, S3, you don't have that. You have complex conjugates of signals. You take X1 or X2, and you have a complex conjugate. Or you have a modulus, which is the magnitude. It's not multiplying the signal itself, which is what the claim accounts for. And if you were to look at the spec, again, this is Appendix 221, Column 12, Line 69, it says the digital copies of the signals to be transmitted are multiplied together. So you're multiplying the signals. It's not a complex conjugate of a signal. If you look up further in the claim, it talks about the signals to be transmitted. So they're the signals that have been multiplied, not complex conjugates of it. And even if we were to take, say, for example, complex conjugates, if you turn to the page 24 of our reply, this is based on the mapping that's on page 17 of their brief. And then on the left-hand column, this is what the claims require. Where are you? Page 24 of our reply. And the left-hand column, this is reproduced from Vanessa's brief on page 17. Left-hand time is what the claims require. And then on the right, this is what, on appeal, where they say this is performed in the radio. And it says performed in group S. Now, the jury didn't see this. That's one problem. But if you look at the third one, it says it maps S3 to be X2 prime. So the complex conjugate of X2. And if you look at the sixth equation, S2 suddenly becomes the modulus or magnitude of X2. So even when they're saying, well, we're not going to use the actual signal X1, X2, we'll use some function of the signal, they map it inconsistently. And that shows they don't have infringement, because it can't be that S3 is two different things at once. If they say S2 is X2 prime, they're missing the sixth equation. If they say that S3 is the complex, excuse me, the modulus of X2, they're missing the third equation. Any way they cut it, they're missing one of those equations. And that's ultimately why they cannot prevail. There's simply no way to come up with. First, you have to have two signals, not three. And if you look at page 17 of their brief, this is the demonstrative. You just kind of swept something else in. There's only two signals, not three. I mean, there could be two signals, but if they were two unique signals, but if one of them was replicated. And I think the short answer is, where's the replication? They still need three separately identifiable signals. And there's simply nothing in the record that shows that you're replicating it and you have a third signal. The expert went out of his way to say, no, I'm counting one signal twice. I don't need an extra signal. I can count the same signal twice, and that's the record I gave you. Without that evidence, they can't have three signals. It's particularly problematic given the prosecution history where they gave up two signals and modified the claim so as to require three. But it's not even the same multiplications that are required. The claims are very specific. It has seven listed out multiplications, right? S1 times S1 times S2, et cetera. How many multiplications are performed in the radio? Conceitedly three. So if you look on page 17 of Finesse's brief, they have this little chart where they try and equate the different colored equations to the claim terms. But three equations isn't seven, and there's no doctrinal equivalence, and the radios only perform three multiplications. Where is it you think that Finesse surrendered the claim scope to two signals? Because I'm not sure I agree with that. So where is it you think they surrendered that in the prosecution history? So when they amended the claims to change it from two or three signals to three signals in response to Filipovic, because Filipovic said recited two signals, I and Q, and the examiner said, no, you can't have that, and so they amended to say three signals because two discloses a claim that has two or three. So they went from two or three signals to three. And the examiner's decision is on 1006 of the appendix, and the original claim is on 1021 to 1022. But that doesn't disclaim having three signals if, in fact, you could duplicate a signal. I think that's correct. That's simply when they say three signals, they mean three signals, not I'm going to have two signals and count one of them twice, which is what the expert did here. But you also need seven multiplications. As you can see from the chart on page 17, and this is Vanessa's chart, they have three colors. There's actually only three multiplications performed. They say they're equivalent, but there's no document equivalence here, and they aren't actually even the same multiplications. So if you look down, the claims call for simple multiplication, S1 times S1 times S2. And what the radio does is this very complex equation with complex multiplication, complex numbers. You have your complex conjugate, so you're going to have to flip the sign of your imaginary number. You have your modulus or magnitude. You're going to measure the distance, not the path. And so it simply doesn't match. And you have literal infringement here. It literally does not infringe on three different grounds. If I can turn quickly, then, to the 134 patent. And that's actually, in some ways, worse still. That patent requires a passband, sampling a passband, with two sorts of signals in it. One is your interference-generating signal, and the other is your signal of interest, the signal of interest you want to receive, and the interference-generating signal that can create intermodulation products in band of your signal of interest and prevent you from getting it. Now, the district court found that the only thing that Vanessa's expert mapped, identified as an interference-generating signal expressly, was the model PIN path. But it's now off the table. Everybody agrees. The model PIN path cannot be the interference-generating signal. It's just not sampled. It doesn't meet the limitation. Help me out here. I'm a little confused by the terminology. It's a reference over and over again to a model PIN path. Is a path a signal? I think this is a problem with the theory to begin with. The model PIN path is simply the path the model PIN follows. But if you were just to say model PIN as opposed to model PIN path, it would still be the same problem. What they have, if you turn to page 15 of our brief, there's a little chart there that everyone takes that's reflecting what the radio actually does. Bear with me a minute. And so if you look, the RFADC in blue, the radio frequency analog-to-digital converter, is what Finesse characterizes as the receiver. But the PIM adaptive model is purple. It's after it, so it never gets sampled by that receiver, and therefore they can't use that in the district court setting. I'm just going to try and simplify and tell me if I get this wrong. The RF analog-to-digital converter is the receiver where the sampling occurs, so it can only sample stuff that's inside of it. The PIM adaptive model generates this PIM signal, and that is generated after the receiver does its sampling, so it can't obviously be sampled by that receiver. That's exactly what the district court held. The only thing they expressly identified was that PIM. But I think their argument is that on that little red line that precedes the receiver, you have two transmit signals that are coming in, X1 and X2. And I'll grant you it's not a model of clarity, but those two signals, can I understand the expert's testimony to be that X1 and X2 are the signal of interest and the download signal also, well, the interference-generating signal. There's two signals, right? And their expert, I mean, look, you caught him in an ah-ha, clearly. I mean, whoever did it with the whole PIM thing. And so then he kind of pivoted, and he starts talking about X1 and X2. So I think there's two problems with that. The first is this court's precedence requires, especially in complex cases, and everyone agrees this is about as complex a case as one can imagine, that the record must- I don't agree with that. Okay. Well, the record still says the record must specifically identify the infringing features of the accused opponents and the reason of when and skill in the art would recognize them as infringing. If you search this document, you will not find a single place where their expert says specifically, as the cases require, X1 and X2 are both the signal of interest and the interference-generating signal. It's not there. But worse, there's nothing where the expert says, here is why they would satisfy what those mean. And he didn't because he couldn't for two reasons. First, if you looked at the expert report, the expert report says the opposite. The expert report doesn't say X1 and X2 are signals of interest and interference-generating signals. It says, quote, as such- Where are you? Pardon? Where are you? Appendix 4477. The quote is, as such, the model PIM signal is the interference-generating signal. So if he'd actually said, hey, my X1, X2 are my interference-generating signal, not my model PIM, that would have been stricken because there would have been an objection because it's not in the record. It's also disavowed. Where were you reading from? 4477, I believe. It's a sideways- So it's the last sentence before the chart. As such, the model PIM is the interference-generating signal. The interference-generating signal capable of generating intermodulation products in band of the signal of interest, not X1, X2, model PIM. The second, it's disavowed, and I hate to keep turning to pages, but this one's 13,838, and this is the Rule 50 response. What page? 15,838. No, 13,838. 13,838. Thank you, Your Honor. And so if you look at that, it says, Dr. Wells never identified either the X1 or X2 signal as both the signal of interest and the interference-generating signal. But that's exactly the theory we now have before us. Yeah, but I think that if I understand their argument right, they're saying he never said X1 is both signal of interest and interference-generating signal. He never said X2 is both signal of interest and interference-generating signal. He never tried to use one of the transmit signals and say it satisfies as both. Right, but I think their position now, if you look at page 13 of their brief in page 33, is X1 and X2 are both the interference-generating signal. No, their position is one of X1 or X2 is interference-generating, and the other of X1 or X2 is the signal of interest. They're saying two signals come in, and they're saying there's two claimed signals. I think that fairly you can understand what they're saying possibly on 13.838 as being we never said X1 was both. We never said X2 was both. But we said here's two, and you need two. And it doesn't matter to us which one you're going to call X1 or which one you're going to call the signal of interest and which one you're going to call the interference-generating signal. So I think if you read two lines up from where they're talking, it tells you what they're actually saying. Okay, tell me. Where? Here's what Wells did say.  Here, Dr. Wells explained to the jury that the red path contains two signals. The documentation describes these as the DLTX reference and the model PIM path. In terms of the patent, the red path contains the signal of interest and the interference-generating signal. So we're talking about the model PIM path, not X1, X2, and we're on Rule 50 at that point opposing our motion. So this is something for which they themselves were not pressing on Rule 50 as a way of supporting the judgment. And ultimately, the notion that one could be one and one could be the other, you're going to have to find that what's happening in the device is that it's actually taking, it's canceling out PIM from X1 to cleanse X2 or PIM from X2 to cleanse X1. That's the whole point. You want to get your signal of interest clear. There's simply nothing in the record that shows that that is what's going on. It just turns the whole thing upside down when the signal of interest is what you want to be getting from the cell phone. The tower wants to hear from the cell phone, and that's not what they're saying it is, the signal of interest. The signal of interest somehow is the transmit signal from the cell tower itself. I see I'm way into my rebuttal. If the court has further questions, I'm happy to answer them, but I also would like to reserve the remainder of my time for rebuttal. Setting aside damages really quickly, which just can't be sustained because running royalty is not the same as a lump sum. Thank you. Okay, Mr. Lampkin, Mr. Clement. Good morning, Your Honors. I may have pleased the court. Paul Clement for the appellees. The jury in this case heard competing testimony as to both infringement and damages. As to infringement, the jury heard Dr. Wells explain on cross-examination that Nokia's own documents showed two signals, X1 and X2, on the red line, which corresponded to the signal of interest in the interference-generating system. Signal, sorry. They also heard him explain how two unique signals could be mapped onto three variables to generate third-order calculations and how the Q's products did just that. And on damages, the jury heard both experts testify. Can you simply explain to us how there are, if you start with the 775 patent, how there are seven multiplications? So there are seven multiplications that are done with the three different variables, which is common ground. They don't have to be unique variables. So you can use one signal twice. And there's no way to use one signal twice, at least no practical way to use one signal twice in these calculations without copying. And there might not be, like, a place in the record where everybody says, we all agree that it was copying when you did the third-order multiplication using S2 for two of the variables. But that's because, like, what else are you going to do? How else are you going to get the second S2 or the first? Maybe it's because Nokia doesn't actually do seven multiplications. I mean, they don't have to have copying if they don't do seven multiplications. But sure they do, with all due respect, Your Honor. If you go to page, I think an easy way to see this is on pages 20 and 21 of the blue brief with those diagrams. In that 4.21 nonlinear block, it's complicated, but if you look that through, you know, in the middle, the blue middle, which is blown up there, you have X1, X1, and then X2 prime. And then you have under it X1 and then X2 sort of squared to the second power. You go those, you take those out. It shows you essentially ten different calculations that are being done. Those calculations correspond on the next page to A0 through A4 for the first and A5 through A9 on the next. They all involve multiplication of three variables. In some cases, there's additional steps like taking the modulus. But all of that's happening. All of that's happening in the device. And you just don't get that second one without copying, which is why nobody disputed it. I mean, copying is not part of the claim terms anyways. So if there's some other way to get, use S2 twice or to use S1 twice or I suppose use S1 three times. So you're saying because three things are being multiplied, there have to be three signals. Yes. And the key thing is. . . Nobody said that. Nobody said that. Nobody said that. No expert said that. Sure. Dr. Wells, I mean, here's the thing. Dr. Wells, what Dr. Wells said, and I think a good place to look on this, is Appendix 15,025 and 26. And this is in cross-examination where what they're actually disputing. Can you use 15,000 just to help? Well, I want you to walk me through this. So 15,000 what? 25 and 26. And I think what's helpful here, the context I'd just like to give you is there's not a place where it says copying because nobody's disputing copying is taking place when you have three order calculations involving two unique signals. You have to have some copying. So that's not what they're cross-examining Dr. Wells on. What they're cross-examining Dr. Wells on is they're still kind of stuck on this theory that you have to have unique signals. And so what they're hitting him on is whether there are really seven different multiplications. And what Dr. Wells testifies here is, I've mapped on, I've showed you seven multiplications, and then the cross-examination is now, but are they seven different multiplications? And he says, oh, well, now you only have three different multiplications. And then this is at lines 12 through 14 on 15.025. I still have seven multiplications, but it results in three different separately identifiable multiplications on the right. So fundamentally it's their argument, in your opinion, that it has to be separately identifiable multiplications, that's why they get to three, but you're saying we still have seven multiplications even though some are repeat multiplications. Is that? That's fair, Your Honor. And I think what they're doing is they're trying to make separately identifiable mean the same thing as unique variable. And it doesn't. And they've been stuck on this idea that it has to be unique signals. And so you can't use one signal twice or one signal three times. And that's wrong. That's the construction that was rejected. And in both the claims and in the accused device, they're using. Does Wallace testify that these seven multiplications actually happen? What is that testimony? I think he does. So where does he do that? I think it's in the same place. And he's using the phrase mapped on to seven. But I think that's what he's saying. And, of course, the documents support that. If you look to Nokia's own documents, and again they're at 20 and 21 of the blue brief, they are showing you these multiplications in the device. Now my friend will tell you, well, those multiplications involve the modulus and the like. And our response to that is you're still doing the three steps. The fact that you're doing something else doesn't take you out of literal infringement. But I don't think mapped on is necessarily the same thing as doing the calculations, actually doing them. Like I feel like there's a difference potentially in that wording. I mean, there is. But at some point I think the burden's on them. This is all taking place in cross-examination. And he's saying I'm mapping it on to seven. And they're not saying, well, show me where it's actually happening. And if they'd done that, he could have pointed to just the same documents I just pointed, which are documents in the record and that support substantial evidence for the jury's finding. I feel like maybe we're like ships crossing in the night here, in that there have to be seven multiplications that take place. It doesn't have to be unique multiplications, but there just have to be seven of them. And I only see three in the Nokia system. And that's my problem, is there have to be seven. Seven has to happen. The Nokia documents you cite in the appendix, those documents themselves, they only show three multiplications. And so I don't have a problem with your repeating signals concept, but I just have to have to actually be seven multiplications. One times two, two times three, seven things have to be multiplied. And I only see three that the Nokia system does. And that's my fundamental problem. With respect, the documents I'm pointing you to show not just seven but ten. Those are calculations that are actually happening. Those are the Nokia documents. They show seven documents. They show, as I say, more than seven. They show ten. But they all reduce down to three. Exactly. They all reduce down to three, and that's what they were trying to do. That was their attempted gotcha moment on this. It wasn't, oh, we don't do seven. There's only three different ones when you get right down to it. But if they reduce down to three, then there's only three. No. With all due respect, you can do seven, and then you can look at it and say, well, because we're only using two variables, it's really just three different ones. And the emphasis in the cross-examination is on this word different. He's trying to say I gotcha because you only have three different equations because you're using one of the variables twice. And our answer to that is both in the claims and in what's actually in the Nokia documents. You are actually doing it, and you have seven multiplications or more. But if you look at them, they amount to three different ones. And our point throughout has been consistent with the idea that their effort to construe three signals as three unique signals is wrong. We don't need seven different multiplications. And we do need to- Is there any expert testimony that there are seven or ten multiplications happening? You mentioned ten, so that's one reason why I'm throwing that out there. I mean, I will say that because this isn't the way they came at this in the cross-examination, you got, you know, I think I've showed you where he says they map onto seven. And I don't see how if they don't point out in real time that they have an issue with the difference between mapped onto and actually did. Like, you know, at a certain point, I mean, you know, he's testifying, he's laying it out, and he's subject to cross-examination. And I don't want to jump, but I realize time's limited. And I think something very similar is the case with respect to the 134 patent. And there I tend to think that the critical thing is just a few pages earlier. And the critical, to me, cross-examination on this whole issue starts at 15,010 and goes through 15,019. And here's what I think is going on here, and I don't think it's that complicated, and I don't think it amounts to any material problem with the 134 patent. And that is, if you look at the document that everybody uses to show this is how this thing actually works- Before you pivot, I mean, I'll give you more time. Don't worry about that. Okay. Before you pivot, could you go to 26486? This is, you know, it's the same thing, I think, that you have at page 21 of your- Yeah, or maybe page 14 of my- I'm looking at page 14 of the red brief, for example. Well, I'm at 26486. I think it's the same thing as you have somewhere or whatever. But how do I see that seven multiplications are being done here? What in this tells me there are seven? Okay, somebody's got to give me the document you're looking at. Okay, yeah. So those are all different multiplications that are being done, and the first- What is? I'm looking under where it says the nonlinear engine is capable of modeling. That's where I think the multiplications are. Where are you? Are you in the same place as that? I think so. I'm looking at A0, A1, A2, A3, A4, which all correspond to- If you go to the red brief at page 14, they correspond to- They're all, as you can see, they're labeled special. And they all correspond to the second blue box. And that second blue box, if you run it across, has these five different sort of places where there's a zero and an X under a red box. And those are all multiplications that are actually happening. And then if you go to the next five numbers down, and they correspond to this thing, they say instead of special, they say cross. Then you go down to the third blue box, it says cross. You go around, and you'll see the sort of five circles with the X. That's actually happening in the document, the product. This is their documents. So, you know, if the issue is does the accused device actually do the seven multiplications, the answer is yes. If the question, which was really the question that they were disputing below and was the subject of the cross-examination is does it need to be seven different or is three different okay, we win on that. And they maybe don't, I hate to say it, map up perfectly. But, I mean, I think that was the dispute below. The testimony is sufficient. And if you have some lingering doubt because of an argument they really weren't pressing below, that you're not doing seven actual, the accused product doesn't do seven actual multiplications, the documents that are in the record disprove that. So if it's okay to switch to the 134, I mean, you know, to me this is all, you know, you can call it a gotcha moment, and I think in some respects that's fair. But it's an understandable gotcha moment that is instantly explained away by Dr. Wells at 15-0-10. And the understandable confusion here, I think, is that he's looking at, as I think we, you know, understand, and I'm now looking at page 12 of the red brief, but it's at 26-4-2-1. It's the document everybody's been looking at probably the most, at least with respect to the 134 patent. And if you look at that, there is the dotted red line, and it goes into the receiver, the RFADC. And I don't really think there's a dispute that there are two transmit reference signals on that red line, that dotted red line, before it gets to the receiver, and they are X1 or X2. Now, it is true that Dr. Wells looked at the legend to Nokia's own document, and it says, red, DLTX reference and modeled PIM path. And he took from their legend that the two signals are like the DLTX and a modeled PIM. Now, it was pointed out, well, it couldn't be modeled PIM because modeled PIM doesn't happen until downstream of that RFADC receiver. And Dr. Wells did not say when that was pointed out on cross-examination, oh, well, we lose. He said, and this is all in 15-0-10 where it's first pointed out. And he responds immediately, well, and I'm quoting now, this is lines 15 through 15 and 16. Well, there's two signals on that red path because we know that, because that's X1 and that's X2. And then for the next eight or nine pages, the cross-examination goes on in great detail. And the counsel for AT&T and Nokia say, well, you said PIM path. And he's like, well, yeah, like I said, PIM path, but it's X1 or X2, and that's what's relevant. Where does he say X1 is the signal of interest and X2 is interference-generating signal or vice versa? Or where does he even say, I don't have to say which is which, but there's two and these are two. Where does he say anything at all? So here's my problem with this. Throughout the entire trial, at all times, in his expert report, even in the JMOL motion, your side is constantly mapping the signal of interest and the interference-generating signal. And the signal of interest is the download reference, and the interference-generating signal is the model PIM path. Always, like all time, boom, boom, boom, throughout. His expert report, his everything. But how could the jury, where did he, when's the first time he said, oh, okay, wait, it's not the model PIM path signal, it's X1 and X2? When it's pointed out on cross-examination, but just to be clear, the theory never changes. It's not like, oh, now we're going to change which receiver it's going into. It was always the two things on that dotted red line that go into that RFADC receiver. That was always the case. All that happened is using Nokia's own document, Dr. Wells said, well, their document calls that whole thing the DL reference and model PIM path. And so I'm going to say, like, I'm going to use as a shorthand that it's the DL reference is the signal of interest and the PIM is, the model PIM is the interference generating signal. Now, I think it's an understandable mistake, and Judge Lynn, you actually alluded to this, which is the legend talks about the model PIM path. And I suppose, like, since at the end of this you get model PIM, it's fair to say it's the model PIM path. But he took from that and erroneously, it turns out, that that meant sort of the two signals corresponded to that. But this is not something that wasn't explored on cross-examination to a fair degree. And if you read the, and, you know, this is what cross-examination is like, but if you read 15010 to 15019, it is as if their counsel said, I got you, and Dr. Wells is saying, no, you don't have me at all. I'm going to continue to explain to you that it's X1 and it's X2. We say continue. Where did he explain it before that? Where before 1510 did he explain it? Because it's not in his expert report and it's not in any of his direct testimony. So where, when you say continue to explain to you it's X1 and X2, implicit in that is that that is what he had represented prior to that moment. Okay, maybe I misspoke by saying continue. Because up to that point, he's laboring under the misimpression that X1 and X2 correspond to DLX and model PIN. But it's just a labeling problem. It's not a substantive problem. No, he's not labeling under that. X1 and X2 are both the DLTX reference signals. They're both transmit signals. That's what they are. That's what your expert knows what they are. That's why he would never answer the question straight up. No, no. With respect, and here's one of the things you have to, I think is a critical fact that makes it clear that, yes, there are two signals on there, X1 and X2. They are both download transmit reference signals. He testifies that. He says that, especially at the point where he's being cross-examination. And one of the things to keep in mind is this is a dual-band radio or a tri-band. Where does he say then that the two DLTX reference signals, two transmit signals, one of them can be interference-generating signal, and the other can be the signal of interest? Where does he say that? He says that. I just can't see it anywhere. With respect, he says it. He doesn't say it, like, all in one place, and I wish he did. I know, because your dot, dot, dot spans 100 pages of testimony. You're like, oh, well, he said this, then dot, dot, dot, he said this. How is the jury supposed to take, you know, a few words from this place in his testimony, and then 100 pages later from this, and say, oh, yeah, that's clear. He's saying X1 and X2 are these two things. It's a breach. It's just such a breach. And after he repeatedly testified that it was the PIM model path signal that was the interference-generating signal, how can the jury possibly follow that now he means it's X1 and X2? Because he says all of that on cross-examination. Just give me 10 pages. Just read 15010 to 15019. I've looked a bunch of times, I assure you. Okay. Tell me what line and sentence you think is best. Tell me what line and sentence. Tell me. Walk me through it. Tell me what you think is best. I think the best lines are at 1510, and I've already given them to you, so I fear I may not persuade you. Well, what line? What, what, what? The exchanges on 12 through, you know, and to me it's clear it's just 12 to 16. So then upstream of the RFADC, before the copy of the transmit signal gets to the RFADC, there's no modeled PIM on that signal, is there? Well, there's two signals on the red path because we know that there's X1 and X2. Correct. The X1 and the X2 are the two transmit signals. Correct. The legend says, and this is where he's trying to correspond them to that, the two signals are the downlink TX reference and the modeled PIM path. And then they go on over that for a while, and then I think you pick it back up. I think everything in there tells you they're talking about. Do you think we should understand his testimony throughout? Well, at all times when he's talked about the modeled PIM path signal, that he always meant X1 or X2. That's what we should understand, that he at all times, this expert, always thought that the signal that is generated by the PIM adaptive model, which is what everybody understands to be the modeled PIM path signal, that he mistakenly was calling it that, but it was really X1, X2? Yeah, I mean. Yeah? Yeah. But here's the thing. It's not like at some point in the case the expert jumped from like the brown path to the red path and changed his theory. The only thing that changed was the nomenclature. And the nomenclature is, you know, like I said, I think his loose language or mistake, if you want to call that, is perfectly understandable because their own document says that it's the modeled PIM path. And even when it's up there before the RFADC, it is on that path, and there are two signals on that path. And again, these are dual band radios. So part of the problem is that you can have interference from one band to the other, and X1 corresponds to one band and X2 corresponds to the other, and you cancel that out. Is there a new signal generated or a different signal that comes out of the PIM adaptive model block? At the very end? After you get out of the receiver, you then go into the PIM adaptive model block. And does that result in a signal? I don't know if it results in a signal. I honestly don't know. But what I know is throughout this case, the receiver was the RFADC. The signal of interest and the interference generating signal, the two things that went into that receiver. The only thing that changed is what should we call it. And Dr. Wells, and again, I don't think you should have to super apologize for looking at their document, which says there's like two concepts going on on that red path, and says, well, one's one, one's the other. But there are two concepts going on in the red path. One of them is the DLTX reference, which is the combined X1 and X2 signals. And the other is the signal that comes out of the PIM adaptive model, which is also on the red path. They're just not both on the red path the entire time. Just like you can be at the start of the Yellow Brick Road and I can be at the end of the Yellow Brick Road. There's two people on the Yellow Brick Road. I don't really disagree with that. But what I do insist on is that throughout this, even when he was calling it the PIM, you know, what is it, the modeled PIM, even when he's calling it the modeled PIM, he's up above the RFADC. And that's why when their lawyer points it out in cross-examination, he's like, oh, yeah, that's downstream. But how do we know when he's calling it the modeled PIM he's up above the RFADC? How do we know that? I think that's consistent with everything he's talked about. The parties had a dispute about whether RFADC was a receiver or not. So all the actions above that. And that's why when it's pointed out, oh, well, modeled PIM is generated downstream from that, he's like, okay, yeah, that would be a problem. He admits in the cross-examination that would be a problem. But that's why so we know it's X1 or X2. And essentially, again, I think if you read those ten pages, you get the – and I think, you know, the district court judge who saw this whole thing, when he's reviewing this argument on JMAW, he specifically says that it's clear in context that he's referring to the X1 or X2 being either the interference generating signal or the signal of interest. And as the chief judge pointed out, nobody's ever said they're both or X1 is both. It's ours, especially with a dual-band radio or a tri-band radio where you've got two of the bands coming down here. One of them is the signal of interest. One of them is the interference generating signal. And you're trying to cancel those out. And that's the value of the product. That's why it's in the product. My friends keep on going to this idea that, well, the only thing that would be valuable is to cancel out the uplink, the so-called brown path. And, again, that was never our theory. It was always their obsession that the only way – and they tried to sort of make this thing – that the only way that this thing could infringe is if somehow you had the uplink and the downlink together on the same path or something. And that was never Dr. Wells' position. It was always upstream of the RFADC. There's two signals. He may have mislabeled them, but there's two signals. They have the potential to create PIM, and they go in, and that's canceled out, and that's some of the value of the invention, and that's why it's turned on in 64,000 devices in the real world. It has value. It does something. And what it does is it gets rid of PIM that's calculated on the downlink. Okay. Thank you, counsel. Thank you. We're going to give Mr. Lampkin five minutes of rebuttal time, but we went way over that with Mr. Clement, and so if you need more time, you can have it. Thank you, Your Honor. I'd like to begin with the issue of two signals versus three and whether or not there's somehow a copy of one of the two signals for multiplication. And so I understand my brother to say that, well, actually, to multiply, you necessarily need to make a copy, and so there's a copy. There's two real problems with that, one legal, one factual. The factual is nobody actually testifies that to do a multiplication inside a computer, and so the computer's doing the multiplication, you actually duplicate the signal twice and then do it. There's simply no testimony. If that were true, it would have been easy enough to have the experts say it, and under intellectual science, there has to be a specific identification of where the infringing device is performing the infringing conduct, and that's just missing. My EEs tell me that computers just don't work that way. You don't waste memory and have the same signal in there twice. You have a pointer pointing to that one signal twice, and you're not going to multiply it by taking the whole thing against itself. You're going to walk through digit by digit or bit by bit or byte by byte, so you're not reproducing the whole thing. But the whole bottom line is, even though I'm wrong about that, it's a matter of what's in the record for the jury to find that this actually has a third signal, and there's simply nothing there. What about the seven multiplications? Because I heard closing counsel saying there were 10 and pointing us to a part of your blue brief and the 8081, et cetera. Can you respond directly to that? Yes, I think I can respond directly to that. The legal problem, if I can have 10 seconds on that, the legal problem is it says given three signals performing these multiplications. So the signals have to exist before the multiplications under the claim. You can't come up with them later. But seven signals. Seven multiplications. Seven multiplications, right. And I think if you look to page 14 of their brief, for example, 15 of their brief, remember these are third-order multiplications, and the question is how many third-order. Where are we? Page 15 of their brief. I'm sorry. You see the two charts there? And you're looking for how many third-order multiplications. I don't see any charts. Page 15 of their brief? Yes. Here's page 15 of their brief. There's no charts. Oh, I'm sorry. Two images. Okay. All right. I'm trying to understand where we are. No, no, no. And so you're looking for third-order equations, three factors, because that's what it calls for. You have three third-order equations. All seven of these are. And what do you have? You have one, two, three on the right-hand side. That's all there is, three third-order equations. If you look down in their brief, nonlinear engines capable of modeling, there's three third-order equations. Now, I know my brother says that, no, but actually testified that there were seven actual multiplications being formed inside. So let me, this is meant to be a technological clarification for me. Let's look at 26485. Mm-hmm. So I think that what Mr. Clement was saying is every one of these blue boxes constitutes a multiplication. Is that what you understand him to be saying also? I do understand him to be saying that. And do you agree that each of those is a third-order multiplication? No, I do not. Why is that what he's saying? Because if you look at the fourth one down in the center, it's a fifth-order application. The one that's labeled NL fifth. So that wouldn't come from the claim, would it? That wouldn't be it. You need third-order. Nth order, third order. And nor would the bottom one, nor the one to the left of it. So there might be ten multiplications that take place, but they're not ten multiplications like the claim require, which is a third-order, seven distinct third-order multiplications. I don't even think there's seven multiplications that take place, because if you look at the testimony from their expert. Yeah, but if I accept what he said is true, that there are ten and these blue boxes represent them. Yes. They can't satiate the S1 times S2 times S3 seven times over. That's exactly right. And that's even apart from the last problem, which is they're not even the same multiplications. I know my colleague has said multiple times, gee, if you have a modulus in there. He never said gee. Okay, if he says if you have a modulus in there, or you have a magnitude, or you have a complex conjugate, it's just an extra step. But the claims actually call for X1 times X2 times X3, or S1, S2, S3, the signals times each other. You don't actually have that happening if what you're multiplying times it is a modulus or a complex conjugate. I don't think you can even mathematically rearrange it to get there. But what matters is happening in what happens in the radio. Is the radio doing what the claims call for? And the radio actually performs the three multiplications, and their expert never said actually does seven. He took the three and mapped it to seven. Before you run out of time, though, I do want to hear about how opposing counsel in places like this Uplink thing will, that you're focused on. You don't need to be focused on Uplink. You should be focused on X1, X2, and there's just a mistake made in terms of calling it PIM model. I need you to respond to that before you sit down. Yeah, so I don't think it can be dismissed as a mistake in nomenclature. And I think there's a point of cross-examination on page 15,018, which makes that clear. What page? 15,018. He specifically asked, are you saying that X1 is the model PIM path? Are you equating X1 with the model PIM path? Is that your mistake? And the expert refuses to answer that in the affirmative. Well, but this goes back to that same thing I caught you on before with the JMAL. I think he's not saying X1 is model PIM path. He's saying there's X1 and X2, and one of them correspond to the signal of interest and one correspond to the interference-generating signal, and I don't know which is which, but it doesn't matter. Because you've got two signals, and we need two signals for this claim. I think that's what he's saying. If that's what he's saying, I'd love to be able to find it in this record, where he actually says X1 is one, X2 is the other. I won't tell you which is which, but one is one, one is the other. He doesn't actually say that. He simply points over and says, well, they're both on the path. 1510, 15000, 010, which my colleague points to, the only thing he says is they're both on the path. Never tells you that one is the interference-generating signal, the other is the signal of interest, and why one is one and one is the other. Why a skilled artisan would understand them to be one and the other. And ultimately the explanation that somehow one is one and one is the other turns the radio on its head. If I could close with this, just turning to page 15 briefly, page 15 of our opening brief, and that just shows you, this is a tale of two paths that creates no infringement. If you're looking for the signal that the radio really wants to receive, that's that uplink for yourself when you're calling, that's your brown path. And so you follow the brown path from the upper right-hand corner down, and if you look at the legend, it tells you the brown path has the UL, Rx, the uplink, and actual PIM paths, it's got actual PIM on there. And you look at the purple box, the uplink has desired UL, desired uplink, and actual PIM, so there's PIM in that one. Then you look to, okay, how are we going to get rid of it? You go to the red path. And the red path has your X1, X2, your DLTX, and it goes... I'm not sure where you are. Where are you? Page 15, upper right-hand corner. It's the red path. And you have your transmit signal go into the RFADC, and it figures out, ah, my transmit signal could create interference. I will model the interference it will make. And then there's a little minus sign in the middle. So you have your uplink signal from the pink at the bottom, with actual PIM. The PIM adaptive model subtracts it, the minus sign, and what you get is the desired uplink in green. So you cleanse, what you're taking the PIM out of is that uplink signal from your cell phone. You're not trying to cleanse X1 of X2 or X2 of X1. And so the whole theory that's been presented here, that somehow your signal of interest and your interference-generated signal are both in that red path, are both transmit signals, doesn't make sense. It's not what the radio does, and that's why it doesn't infringe. And the transmit signals and the receive signals are in different bands, are they not? Yes. They're going to be in different bands, exactly. And the reason you have a problem with the intermodulation is if your transmit signals, they can mix, they can bounce off things they mix, you have loose connectors they mix, and it can shift it in band of your signal of interest. And so what you want to do is, your uplink signal, if something shifted and got in there, you want to cancel out the PIM. But you're not canceling PIM out of your transmit signal, one of the two, TX1 or X2. You're canceling PIM out of your uplink, which is why the claim refers to canceling PIM in band of the signal. And all through, the only place you're going to see in band is you're going to see in band of the signal of interest. You're cleansing out PIM in band of the signal of interest. They're trying to cleanse PIM of the transmitted signal sense, which just doesn't make any sense. The court has... One last question for you. My understanding, the relief you're seeking is a straight reverse. Is there any reason, if we were to agree with you, why we need to vacate instead? No, Your Honor, because what was presented to the jury is simply insufficient as a matter of law to sustain infringement. So that would be reversed for entry of judgment. With respect to the damages issue, which we haven't discussed, that would be a new trial for damages. Well, what if we agree with you on one and not the other? Yeah, if you agree with us on one and the other, and I'll beg you not to, the answer would be you'd have to have a remand for a retrial with respect to damages, because we only have one damages figure for everything. Is there any further questions? Thank you, Your Honor. You ask that the judgment be reversed. I thank both counsel. The case is taken under submission. You both did a very good job of helping the court understand this technology.